IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

JOHN BALL,

     Plaintiff,

v.

BOARD OF REGENTS OF THE
UNIVERSITY SYSTEM OF
GEORGIA,

     Defendant.

CIVIL ACTION FILE NO.
1:20-cv-00012-SDG-LTW

## MAGISTRATE JUDGE'S FINAL REPORT AND RECOMMENDATION

Plaintiff John Ball filed the above-styled employment discrimination action on January 2, 2020. [Doc. 1]. Plaintiff Ball's Amended Complaint, which was filed on March 20, 2020, is the operative pleading in this case. [Doc. 4]. Plaintiff's claims against Defendant Board of Regents of the University System of Georgia are for disability discrimination and retaliation brought pursuant to the Rehabilitation Act, 29 U.S.C. § 701, *et seq.* [Doc. 4, Counts I, II]. This action is presently before the Court on a Motion for Summary Judgment [Doc. 42] filed by Defendant pursuant to Federal Rule of Civil Procedure 56. For the reasons discussed below, the Court

**RECOMMENDS** that Defendant Board of Regents' Motion for Summary Judgment [Doc. 42] be **GRANTED**.

I.    <u>FACTS</u>[1]

The Board of Regents of the University System of Georgia ("Board of Regents") is the governing body of the University System of Georgia, including Georgia Southern University ("GSU").   [Defendant's Statement of Material Facts ("DSMF") ¶ 1]. Plaintiff John Ball was employed with the GSU football team (most recently) as the Football Video Coordinator ("FVC") from July 2013 to March 2019.  [DSMF ¶ 2; Plaintiff's Statement of Material Facts ("PSMF") ¶ 1].  In October 2018, Plaintiff underwent surgery to have his foot amputated.  [PSMF ¶ 2].  Plaintiff Ball was on medical leave from October 2018 to early January 2019.  [DSMF ¶ 3].

During Plaintiff's absence, the Head Football Coach at GSU, Chad Lunsford, hired Sean Fitzgerald as interim FVC during Plaintiff's absence.   [DSMF ¶ 4; Plaintiff's Response ("Pl. Resp.") to DSMF ¶ 4].  The FVC's job is to plan, edit, and produce the football team's videography.  [DSMF ¶ 5].  Based on experience at a prior school, Fitzgerald performed his duties on the field during team practices because he

---

[1] The facts are taken primarily from Defendant's Statement of Material Facts [Doc. 42-2], Plaintiff's Responses thereto [Doc. 53-1], Plaintiff's Statement of Additional Material Facts [Doc. 53-2], and Defendant's Responses thereto [Doc. 55].

believed it allowed him and the video staff to be more responsive to changes made by the head coach during practice. [DSMF ¶ 6]. GSU had not previously asked FVCs to perform their duties on the field during practice. [DSMF ¶ 7]. Coach Lunsford found the change helpful and wanted the FVC to continue working on-field during practices. [DSMF ¶ 8].

Plaintiff Ball returned to work on January 7, 2019, with his return-to-work paperwork stating that no accommodations or restrictions were needed. [DSMF ¶ 9]. By the time Plaintiff returned to the FVC job, Sean Fitzgerald had been moved to Director of Football Operations. [DSMF ¶ 10; Pl. Resp. to DSMF ¶ 10]. In this position, Fitzgerald oversaw Plaintiff in his role as FVC. [Id.].

Although Plaintiff's amputated foot significantly limited his mobility, he was generally able to perform his duties as FVC the same as before he went on leave. [DSMF ¶ 11; PSMF ¶ 3; Defendant's Response ("Def. Resp.") to PSMF ¶ 3]. However, Plaintiff was functionally limited and his supervisors noticed problems and delays in completing various job-related tasks. [DSMF ¶ 12; Pl. Resp. to DSMF ¶ 12]. Plaintiff could not walk upstairs to retrieve something from the press box or climb towers to film practice; however, he was able to delegate those tasks to student assistants. [PSMF ¶ 4]. Approximately a week after returning to work in January 2019, Plaintiff met with Sean Fitzgerald, Director of Football Operations, and Lisa Sweany, Deputy Athletic

Director.  [PSMF ¶ 5].  Plaintiff reported that he was able to perform the job of FVC with the help of student assistants.  [PSMF ¶ 5].

In late-January or early-February 2019, the Head Football Coach, Chad Lunsford, told Plaintiff that he wanted the FVC to be on the field during practice. [PSMF ¶ 6].  Plaintiff said that he could not get on the field because of his wheelchair. [PSMF ¶ 7].  Lunsford told Plaintiff to "figure it out" and left the room.  [PSMF ¶ 8].

In early January 2019, the athletic department communicated to its directors to ensure that employees who had accumulated compensatory time (sometimes called "comp time") were using that time before regular leave.  [DSMF ¶ 15].  Sean Fitzgerald noticed in late January that Plaintiff Ball did not show up for work on multiple days. [DSMF ¶ 16].  Fitzgerald testified that because he had previously received a leave request when Plaintiff was absent, the absences caught his attention and indicated something could be amiss.  [DSMF ¶ 17].  At some point, Deputy Athletic Director Lisa Sweany instructed Fitzgerald to find out if Plaintiff had been paid for working those days.  [Fitzgerald Deposition ("Dep.") at 39-40, 44; Sweany Dep. at 14-15; DSMF ¶ 18; Pl. Resp. to DSMF ¶ 18].  On February 12, 2019, Chief Audit Officer Jana Briley was informed that Sweany would be contacting her regarding a possible timekeeping issue.  [DSMF ¶ 19].

On February 12, 2019, Plaintiff met with Samantha Rossi, a Human Resources ("HR") Benefits Manager for GSU. [PSMF ¶ 9]. Plaintiff informed Rossi that he was unable to comply with Coach Chad Lunsford's order to be on the field during practice because of his disability. [Id.]. Plaintiff requested an accommodation for getting to the practice field across campus and for performing his duties on the practice field. [DSMF ¶ 20]. This was the first time Plaintiff told HR that he was having issues with his mobility which prevented him from getting to the practice field. [DSMF ¶ 21]. This was also the first time Plaintiff told HR that Coach Lunsford had asked him to be on the field during practice as Fitzgerald had done during Plaintiff's absence. [Id.]. Plaintiff told HR Benefits Manager Rossi that he did not feel he was physically able to work on the field during practice and that Coach Lunsford asked him to figure something out. [DSMF ¶ 22]. Plaintiff requested that he receive assistance in getting to the offsite practice facility and that he not be required to work on the field. [DSMF ¶ 23]. Plaintiff proposed several possible accommodations for Coach Lunsford's request, including use of a golf cart and help from student assistants to compensate for his mobility issues. [PSMF ¶ 10].

On February 15, 2019, three days after Plaintiff's first meeting with HR Benefits Manager Samantha Rossi, Plaintiff met with Rossi a second time regarding his accommodation request. [PSMF ¶ 12]. Rossi discussed Plaintiff's accommodation

request with Director of Football Operations Sean Fitzgerald, Deputy Athletic Director Lisa Sweany, and two employees from Legal Affairs, Amber Culpepper and Maura Copeland. [PSMF ¶ 13]. Sometime after this meeting, Fitzgerald informed Plaintiff that he was granted accommodations to get to the offsite practice facility and was not required to perform his duties on the field. [DSMF ¶ 24; PSMF ¶ 14]. GSU honored these accommodations. [DSMF ¶ 25]. Plaintiff was allowed to observe the practice field from a distance and give necessary directions to his student assistants. [DSMF ¶ 25; PSMF ¶ 14]. Plaintiff also purchased walkie-talkies to communicate with the student assistants during practice. [PSMF ¶ 11].

On one occasion during a staff meeting, Coach Lunsford told Plaintiff Ball to get two tables from the surplus room and use them to cover wires in two meeting rooms. [PSMF ¶ 15; Plaintiff's Deposition ("Pl. Dep.") at 34]. Plaintiff told Lunsford he was not able to get to "surplus" because of his disability, and Lunsford told him to "figure out a way to do it, because he wanted the wires covered up." [Id.]. Lunsford repeatedly asked Plaintiff if he had fixed the wires, and Plaintiff told him that he could not "do it physically right now." [PSMF ¶ 16; Pl. Dep. at 34-35]. Plaintiff testified that with regard to these type of day-to-day duties, he did not ask HR about accommodations, but he did ask for help from graduate assistants who were available to assist him and complete Lunsford's request. [Pl. Dep. at 36]. Plaintiff testified that Coach Lunsford

6

and Sean Fitzgerald "were very friendly to [him] before everything happened. No disputes, no nothing. And then when the issues happened with [Plaintiff] coming back to work and the requests [he] had, they were just a little not so friendly[.]" [Pl. Dep. at 35; PSMF ¶ 18].

On or around January 22, 2019, Fitzgerald began keeping a timeline that recorded several instances in which Plaintiff failed to complete tasks or was absent from work. [PSMF ¶¶ 17, 19; Fitzgerald Dep. at 26-27, 35; Doc. 45-3]. Fitzgerald later provided this timeline to Deputy Athletic Director Lisa Sweany after she asked for any documentation Fitzgerald had on Plaintiff. [PSMF ¶ 20]. However, Fitzgerald did not know why Sweany requested the document. [PSMF ¶ 21]. It was Fitzgerald's understanding that Sweany was requesting the documentation for "HR accommodation purposes." [PSMF ¶ 22]. Fitzgerald further stated that Sweany reviewed the timeline he provided and asked why he wrote "check to see if he was paid" in parentheses next to the entries for January 22, 29, and 30, 2019. [PSMF ¶ 23].

On or around February 12, 2019, Denise Gebara, Director of Employee Relations, sent an email to Mary Jana Briley, then the Chief Audit Officer, informing Briley that Sweany "would be contacting [her] regarding some hours in question input into the time system by Mr. Ball." [PSMF ¶ 24]. Sometime later, Sweany contacted Briley and explained that Fitzgerald suspected Plaintiff had entered working hours for

days he was absent. [PSMF ¶ 25]. Briley then conducted an investigation into Plaintiff's reporting of his timekeeping. [DSMF ¶ 26; PSMF ¶¶ 25, 29]. Plaintiff testified that while the timekeeping investigation was ongoing, Fitzgerald told Plaintiff, "Don't worry about it. It's just a witch hunt." [Pl. Dep. at 69; PSMF ¶ 28].[2]

On February 21, 2019, Fitzgerald met with Plaintiff to discuss the need to follow proper leave procedures. [PSMF ¶ 26]. In a follow-up memo to Plaintiff, Fitzgerald wrote, "If you do not make me aware of missing work in a timely manner, it may lead to disciplinary action up to and including termination. So, starting now, you must make me aware of you missing a work shift within 30 minutes of that shift beginning or any time earlier." [PSMF ¶ 27].

On February 27, 2019, Chief Audit Officer Jana Briley completed her investigation of Plaintiff's timekeeping reporting. [DSMF ¶ 26; PSMF ¶ 29]. Briley then circulated her findings to other employees in an Internal Audit Report. [Id.]. The Report found that Plaintiff had falsified his timesheets for January 22, 29, and 30, 2019. [DSMF ¶ 27; Pl. Resp. to DSMF ¶ 27; PSMF ¶ 30; Doc. 44-1]. Although Plaintiff was absent from work on these three days, he recorded on his timesheets that he had worked regular hours instead of comp time. [Id.]. In particular, the Internal Audit Report found

---

[2] Fitzgerald testified, "I never told John Ball that the investigation into his timekeeping fraud was a 'witch hunt.'" [Fitzgerald Dec. ¶ 15].

that "Mr. Ball was absent from work for [those] days, he did not request leave for the days he was absent, he did not notify his supervisor of his absence on January 22, 2019, and he did not notify his supervisor in a timely manner for his absences on January 29-30, 2019." [DSMF ¶ 28].  The Report also noted, "When asked about being absent from work on the dates listed above, Mr. Ball stated he was at work and only remembered being absent one day – either January 29th or 30th; however, he could not recall which day." [Doc. 44-1 at 1].  Plaintiff admitted during his deposition that the Internal Audit Report's conclusions were correct.  [DSMF ¶ 29].  Plaintiff was asked and testified to the following:

> Q.  Based on what we just said, that you were absent from work and did not request leave in advance of it but billed the time, is it fair to say that that sentence is accurate?
>
> A.  Yes.

[Pl. Dep. at 44].  Falsifying time violates GSU policy.  [DSMF ¶ 30].  When an employee is found to have falsely entered time, the standard practice at GSU is to fire the employee.  [DSMF ¶ 31].  Chief Audit Officer Briley recommended in the Internal Audit Report, *inter alia*, that Plaintiff adhere to the relevant procedures and receive training on time entries, leave requests, and use of compensatory time, and that Plaintiff's supervisor should "receive guidance from Human Resources regarding appropriate disciplinary action for Mr. Ball's actions." [PSMF ¶ 31; Doc. 44-1 at 2].

After Briley circulated the Internal Audit Report, she was asked by email if she had a recommendation for consequences of Plaintiff's actions.  [PSMF ¶ 32; Doc. 44-2].   Briley responded, "Athletics will work with Human Resources for any consequences.  HR will look at [Plaintiff's] work history to see if he's had any prior reprimands, etc., and that will determine the direction to take with the employee."  [Id.].  Shortly thereafter, HR Manager Samantha Rossi wrote to Briley, "Once a decision has been made on this, I may need your expertise on moving forward with handling [Plaintiff's] request for a temporary accommodation."  [PSMF ¶ 33; Doc. 44-2].

After Employee Relations Director Denise Gebara received the Internal Audit Report, she reviewed the Report and examined GSU's practice for time theft.  [DSMF ¶ 32].   Gebara found that in all but unusual circumstances, termination was the appropriate sanction.  [DSMF ¶ 33].  Gebara informed the heads of Legal Affairs (Maura Copeland) and HR (Rebecca Carroll) of her findings and was instructed to convey to the football department her recommendation to terminate Plaintiff's employment.  [DSMF ¶ 34; Gebara Dec. ¶ 13].  Gebara was asked and testified to the following:

> Q.  Did you review prior instances of similar misconduct to determine how discipline had been issued?
>
> A.  Yes, I did.
>
> Q.  And what did you find?

10

A.  I found that in cases where the employee put in time into OneUSG saying that they worked and it was discovered that they were not, that we terminated.

Q.  And who asked you to find that information?

A.  That's part of what my job is, to makes sure we treat the different disciplinary actions similarly across the university.

Q.  Who did you inform of your results?

A.  Rebecca Carroll [from HR] and Maura Copeland [from Legal Affairs].

[Gebara Dep. at 13].  Gebara also testified that Carroll and Copeland told her that Plaintiff would be terminated because of the Internal Audit Report.  [PSMF ¶ 39; Gebara Dep. at 10-12].  Gebara was asked and testified to the following:

Q.  Did they give you any reasons for [Plaintiff's] termination other than what was included in the audit report?

A.  No.

[Gebara Dep. at 12].  Gebara stated that Copeland and Carroll instructed her to "work with athletics to make sure that we do this right."  [Gebara Dep. at 11; PSMF ¶ 41].

Deputy Athletic Director Lisa Sweany testified that within a day or two after the Internal Audit Report was issued, she met with Director of Football Operations Sean Fitzgerald and Employee Relations Director Denise Gebara.  [PSMF ¶¶ 34, 35; Def. Resp. to PSMF ¶ 34; Sweany Dep. at 16-17].  During this meeting, Gebara recommended that Plaintiff's employment be terminated "because of previous

11

situations where somebody had falsified a time card and they were terminated." [PSMF ¶¶ 34, 35; Def. Resp. to PSMF ¶ 34; Sweany Dep. at 16-17]. Sweany testified that Coach Chad Lunsford and Athletic Director Tom Kleinlein had final authority over the decision to terminate Plaintiff. [PSMF ¶ 36].

On March 11, 2019, Director of Football Operations Fitzgerald gave Plaintiff a notice of termination. [PSMF ¶ 37]. In addition, Fitzgerald and Deputy Athletic Director Sweany informed Plaintiff why he was being fired. [DSMF ¶ 35; PSMF ¶ 37]. Plaintiff admitted to Fitzgerald and Sweany that he had entered incorrect hours on his timesheets. [DSMF ¶ 36]. Plaintiff testified in his declaration: "I never told Denise Gebara or anyone else that I did not think I received what I deserved while on FMLA leave." [Pl. Dec. ¶ 2]. Plaintiff also testified, "I never told Denise Gebara or anyone else that I knowingly entered false hours in my timesheet." [Pl. Dec. ¶ 3]. According to Plaintiff, he filled out his timesheet at the end of January 2019 for the preceding pay period, but he did not knowingly submit incorrect hours. [Pl. Dec. ¶ 4].

Prior to his termination, Plaintiff had not received any disciplinary actions while employed with Defendant. [PSMF ¶¶ 38, 45]. Plaintiff declined to appeal his termination under University System of Georgia policy. [DSMF ¶ 38]. While the present litigation was pending, Plaintiff gave an interview to the Statesboro Herald, in which he acknowledged that he had entered incorrect hours. [DSMF ¶ 39].

12

Additional facts will be set forth as necessary during discussion of Plaintiff's claims.

## II.   <u>SUMMARY JUDGMENT STANDARD</u>

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial responsibility of asserting the basis for its motion. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986); <u>Apcoa, Inc. v. Fidelity Nat'l Bank</u>, 906 F.2d 610, 611 (11th Cir. 1990). The movant is not required, however, to negate its opponent's claim; the movant may discharge its burden by merely "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." <u>Celotex</u>, 477 U.S. at 325. After the movant has carried its burden, the non-moving party is then required to "go beyond the pleadings" and present competent evidence designating specific facts showing that there is a genuine disputed issue for trial; the non-moving party may meet its burden through affidavit and deposition testimony, answers to interrogatories, and the like. <u>Id.</u> at 324 (quoting Fed. R. Civ. P. 56(e)).

While the court is to view all evidence and factual inferences in a light most favorable to the non-moving party, <u>Nat'l Parks Conservation Ass'n v. Norton</u>, 324 F.3d 1229, 1236 (11th Cir. 2003), "the mere existence of *some* alleged factual dispute

between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact," Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original). A fact is material when it is identified as such by the controlling substantive law.  Id. at 248.  Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted).  Instead, "the nonmoving party must present evidence beyond the pleadings showing that a reasonable jury could find in its favor."  Fickling v. United States, 507 F.3d 1302, 1304 (11th Cir. 2007) (citing Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990)).  An issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely colorable" or is "not significantly probative."  Anderson, 477 U.S. at 249-50.  Thus, the Federal Rules mandate the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of *every* element essential to that party's case on which that party will bear the burden of proof at trial.  Celotex, 477 U.S. at 322.

## III.   DISCUSSION

Plaintiff John Ball asserts that Defendant Board of Regents subjected him to disability discrimination and retaliation in violation of the Rehabilitation Act, 29

14

U.S.C. § 701, *et seq.*  [Doc. 4, Counts I, II].  Specifically, Plaintiff alleges in Count I that Defendant terminated his employment on the basis of his disability.  [Doc. 4 ¶¶ 25-31].  Plaintiff alleges in Count II that Defendant terminated his employment in retaliation for engaging in protected activity under the Rehabilitation Act.  [Doc. 4 ¶¶ 25-31].  Defendant Board of Regents argues in its summary judgment motion that both of Plaintiff's claims should be dismissed.  [Doc. 42].

### A.    Disability Discrimination Claim

"The Rehabilitation Act prohibits recipients of federal financial assistance from discriminating against individuals with disabilities."  Garrett v. University of Alabama at Birmingham Board of Trustees, 507 F.3d 1306, 1310 (11th Cir. 2007) (citing Bragdon v. Abbott, 524 U.S. 624, 632 (1998)).   The relevant language of the Rehabilitation Act provides: "No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794(a).  "Discrimination claims under the Rehabilitation Act are governed by the same standards used in ADA cases[.]" Cash v. Smith, 231 F.3d 1301, 1305 (11th Cir. 2000) (citing 29 U.S.C. § 794(d)).  The ADA, and thus the Rehabilitation Act, prohibits covered employers from discriminating "against a qualified individual on the basis of disability in regard to job

application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a); accord Wascura v. City of South Miami, 257 F.3d 1238, 1242 (11th Cir. 2001).

Plaintiff Ball claims that Defendant terminated his employment on the basis of his disability in violation of the Rehabilitation Act. [Doc. 4, Count I]. Plaintiff's disability discrimination claim is evaluated using the burden-shifting framework established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Holly v. Clairson Industries, L.L.C., 492 F.3d 1247, 1255 (11th Cir. 2007) ("Under the controlling law in this Circuit, '[t]he burden-shifting analysis of Title VII employment discrimination claims is applicable to ADA claims.'") (quoting Earl v. Mervyns, Inc., 207 F.3d 1361, 1365 (11th Cir. 2000)). Under this framework, the allocation of burdens and order of presentation and proof are as follows: (1) the plaintiff has the burden of proving a *prima facie* case of discrimination; (2) if the plaintiff succeeds in proving the *prima facie* case, the burden shifts to the defendant to articulate some legitimate, non-discriminatory reason for the action taken against the employee; and (3) should the defendant carry this burden, the plaintiff must have an opportunity to prove that the legitimate reason offered by the defendant was a pretext for discrimination. See McDonnell Douglas, 411 U.S. at 802-05.

16

To establish a *prima facie* case of disability-based discrimination, a plaintiff must demonstrate that: (1) he has a disability as defined in the ADA; (2) he is a "qualified individual"; and (3) "he was subjected to unlawful discrimination because of his disability." Mazzeo v. Color Resolutions Int'l, LLC, 746 F.3d 1264, 1267-68 (11th Cir. 2014) (citing Holly, 492 F.3d at 1256)). "For the first element of an ADA claim, a plaintiff qualifies as disabled under the ADA if he has '(A) a physical or mental impairment that substantially limits one or more of the major life activities . . . ; (B) a record of such an impairment; or (C) [is] regarded as having such an impairment." Greenberg v. BellSouth Telecomms., Inc., 498 F.3d 1258, 1264 (11th Cir. 2007) (quoting 42 U.S.C. § 12102(2)).  A plaintiff is a "qualified individual" if, with or without reasonable accommodations, he can perform the essential functions of the job he holds.  See Mazzeo, 746 F.3d at 1267-68.  Defendant Board of Regents implicitly acknowledges that Plaintiff Ball is able to establish the first two elements because he is disabled as a result of his foot amputation and he is able to perform the essential functions of his job as an FVC.  [Doc. 42-1 at 12].

The final *prima facie* element requires Plaintiff to offer evidence which would permit a reasonable jury to find that he was terminated because of his disability.  The Eleventh Circuit has held that a plaintiff may satisfy this element by showing that his employer treated "similarly situated" employees outside his protected class more

17

favorably.  See Lewis v. City of Union City, Georgia, 918 F.3d 1213, 1220-21, 1235 (11th Cir. 2019) (en banc).  Even if a plaintiff is unable to identify a similarly situated comparator, the Eleventh Circuit has made it clear that the "failure to produce a comparator does not necessarily doom the plaintiff's case." Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011).  Summary judgment is improper "if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." Id. (citation and internal quotation marks omitted).  However, this court has explained:

> Smith does not represent an alternative analytical framework to that established by McDonnell Douglas and its progeny; instead, it sets out an alternative way for plaintiffs to satisfy the prima facie case requirement . . . . Put simply, Smith holds that plaintiffs can establish a prima facie case, as required by McDonnell Douglas and its follow-on cases, without pointing to a similarly situated comparator.

King v. Ferguson Enterprises, Inc., 971 F. Supp. 2d 1200, 1214 (N.D. Ga. 2013), aff'd, 568 F. App'x 686 (11th Cir. 2014) (per curiam).  Thus, at the *prima facie* stage under McDonnell Douglas, a "plaintiff must carry the initial burden of offering evidence adequate to create an inference that an employment decision was based on a discriminatory criterion illegal under the Act." International Broth. of Teamsters v. United States, 431 U.S. 324, 358 (1977).

18

In the present case, Plaintiff is unable to carry this burden.  Plaintiff does not cite to any evidence adequate to create an inference that Defendant's decision to terminate his employment was based on his disability.  [Doc. 53 at 8-9].  When a plaintiff seeks to establish discriminatory motive by pointing to a similarly situated employee, the Eleventh Circuit has held that the plaintiff and his comparators must be "similarly situated in all material respects."  Lewis, 918 F.3d at 1226.  In cases like the present one where the plaintiff has engaged in misconduct, a similarly situated comparator will be an employee who "engaged in the same basic conduct (or misconduct) as the plaintiff," "will have been subject to the same employment policy, guideline, or rule," and "will share the plaintiff's employment or disciplinary history."  Id. at 1227-28.  Plaintiff Ball acknowledged that although he was absent from work for three days in January 2019, he recorded on his timesheet that he worked regular hours during those days.  [DSMF ¶ 29; Pl. Dep. at 44].  The record reveals that falsifying time violates GSU policy and when an employee is found to have falsely entered time, the standard practice at GSU is to fire the employee.  [DSMF ¶¶ 30, 31].

Plaintiff does not point to any individual outside his protected class who engaged in the same basic misconduct but was treated more favorably.  [Doc. 53 at 8-9].  Instead, in the argument portion of Plaintiff's response brief filed in support of his disability discrimination claim, Plaintiff points to the fact that an employee named Phillip Guard

replaced him.  [Id. at 8].  But on this issue, the only record evidence offered by Plaintiff is Coach Chad Lunsford's testimony that he was not aware if Guard had a physical or mental disability.  [Lunsford Dep. at 8-9].  Plaintiff, in other words, has not only failed to identify a similarly situated employee, but he has not established that Guard was not disabled.  Plaintiff only points out that Coach Lunsford did not know if Phillip Guard had a disability.  [Doc. 53 at 8].  The fact that Coach Lunsford was not aware if the person who replaced Plaintiff was disabled or not disabled is not sufficient to establish a *prima facie* case of disability discrimination.

Plaintiff also argues the treatment he received after he returned from medical leave supports a finding that he was terminated based on his disability.  [Doc. 53 at 9].[3] Plaintiff asserts that Director of Football Operations Sean Fitzgerald and Lunsford treated him differently after he returned from leave.  [Id].  Plaintiff testified that Lunsford and Fitzgerald "were very friendly to [him] before everything happened.  No disputes, no nothing.  And then when the issues happened with [Plaintiff] coming back to work and the requests [he] had, they were just a little not so friendly[.]"  [Pl. Dep. at 35; PSMF ¶ 18].  In addition, Plaintiff notes that he was terminated just a few weeks after GSU granted him the accommodations he requested.  [Doc. 53 at 9].  Plaintiff

---

[3] In this section of Plaintiff's brief, he does not offer any citations to the record. [Doc. 53 at 9].

argues that given these circumstances, "it would be reasonable for a jury to conclude that Lunsford wanted someone in the FVC position who was not disabled." [Id.]. The undersigned disagrees.

Plaintiff's assertion that Lunsford and Fitzgerald "were just a little not so friendly" when he came back to work is merely a vague allegation that would not permit a reasonable jury to conclude that decisionmakers at GSU were motivated by disability-based discriminatory animus. With regard to Plaintiff's contention that the timing of his termination supports a finding of discrimination, the Court also finds this argument lacking. Plaintiff met with HR Benefits Manager Samantha Rossi on February 12, 2019 and requested that he receive assistance in getting to the offsite practice facility and that he not be required to work on the field. [PSMF ¶ 9; DSMF ¶¶ 20, 23]. Shortly thereafter, Plaintiff was granted these accommodations. [DSMF ¶¶ 24, 25; PSMF ¶ 14]. Plaintiff was allowed to observe the practice field from a distance and give necessary directions to his student assistants. [Id.]. Plaintiff notes that he was terminated just a few weeks later; however, the fact that GSU actually granted Plaintiff the requested accommodations shortly before he was terminated does not bolster his argument that he was fired because of his disability. In addition, an investigation of Plaintiff's timekeeping reporting found that he had falsified his timesheets for three days in late January 2019, and Plaintiff admitted that the Internal Audit Report's

findings on these issues were correct.  [DSMF ¶¶ 27, 29; Pl. Resp. to DSMF ¶ 27; PSMF ¶ 30; Doc. 44-1; Pl. Dep. at 44].  A reasonable jury could not examine these facts and conclude that Defendant's decision to terminate Plaintiff's employment was motivated by disability-based discriminatory animus.

In conclusion, the Court finds that Plaintiff has failed to establish a *prima facie* case of disability-based discrimination.  Plaintiff is able to show that he has a disability and is a "qualified individual," but he has not cited to evidence that he was discriminated against because of his disability.  See Mazzeo, 746 F.3d at 1267-68. Furthermore, even assuming *arguendo* Plaintiff were able to establish a *prima facie* case of discriminatory termination, the undersigned would recommend that summary judgment be granted on Plaintiff's claim.  As discussed *infra*, Defendant has presented a legitimate, non-discriminatory reason for terminating Plaintiff's employment, namely, falsification of timesheets, and Plaintiff has not offered evidence that Defendant's proffered reason is a pretext for discrimination.  For these reasons, it is **RECOMMENDED** that Defendant Board of Regents' Motion [Doc. 42] for Summary Judgment be **GRANTED** on Plaintiff's Rehabilitation Act claim that Defendant terminated his employment on the basis of his disability.  [Doc. 4, Count I].

### B.    Retaliation Claim

Plaintiff Ball alleges in Count II of his Amended Complaint that Defendant

22

terminated his employment in retaliation for engaging in protected activity under the Rehabilitation Act.  [Doc. 4 ¶¶ 25-31].  "The Rehabilitation Act incorporates the anti-retaliation provision from [the ADA]."[4] <u>Burgos-Stefanelli v. Secretary, U.S. Dep't of Homeland Sec.</u>, 410 F. App'x 243, 245 (11th Cir. 2011) (citations omitted).  Because the ADA's "anti-retaliation provision is similar to Title VII's prohibition on retaliation," courts in the Eleventh Circuit "assess retaliation claims pursuant to the Rehabilitation Act under the framework . . . use[d] in assessing Title VII retaliation claims."  <u>Id.</u> (citations omitted).  "To establish a *prima facie* case of retaliation, a plaintiff must show: (1) statutorily protected expression; (2) adverse employment action; and (3) a causal link between the protected expression and the adverse action."  <u>Stewart v. Happy Herman's Cheshire Bridge, Inc.</u>, 117 F.3d 1278, 1287 (11th Cir. 1997) (citation omitted).  "Once a *prima facie* case is established, the burden then shifts to the defendant employer to come forward with legitimate non-discriminatory reasons for its actions that negate the inference of retaliation."  <u>Id.</u>  If the defendant meets that burden, the plaintiff must then present evidence demonstrating that the employer's

---

[4]  The ADA provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."  42 U.S.C. § 12203(a).

proffered legitimate reasons are merely a "pretextual ruse designed to mask retaliation." Id.

Plaintiff Ball is able to establish the first two *prima facie* elements. Plaintiff engaged in statutorily protected expression when he requested an accommodation for his disability. See Singleton v. Public Health Trust of Miami-Dade County, 725 F. App'x 736, 738 (11th Cir. 2018) (holding that a request for accommodation constitutes protected activity under the ADA); Bagwell v. Morgan County Comm'n, 676 F. App'x 863, 869 (11th Cir. 2017) (same); Frazier-White v. Gee, 818 F.3d 1249, 1258 (11th Cir. 2016) ("The first element may be met by a request for a reasonable accommodation."). Plaintiff met with HR Benefits Manager Samantha Rossi on February 12 and 15, 2019, and informed her that he was unable to comply with Coach Chad Lunsford's order to be on the field during practice because of his disability. [PSMF ¶¶ 9, 12]. Plaintiff requested an accommodation and asked, *inter alia*, that he not be required to work on the field. [DSMF ¶¶ 20, 22, 23]. Plaintiff is also able to show that he suffered an adverse employment action because he was terminated from his employment on March 11, 2019. [DSMF ¶ 35; PSMF ¶ 37].

The final *prima facie* element in support of Plaintiff's Rehabilitation Act retaliation claim requires him to show that there was a causal link between his request for an accommodation and his termination. See Frazier-White, 818 F.3d at 1258. This

"element requires a showing of but-for causation."  Id. (citing University of Texas Southwestern Medical Center v. Nassar, 570 U.S. 338, 362 (2013)).  If an employer takes an adverse employment action against an employee shortly after becoming aware of the employee's protected expression, then the close temporal proximity between the two events is sufficient to meet the but-for causation requirement.  See Adams v. City of Montgomery, 569 F. App'x 769, 773 (11th Cir. 2014) (citing Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007)).  In the present case, Plaintiff asked for an accommodation on February 12 and 15, 2019, and he was terminated less than a month later on March 11, 2019.  [DSMF ¶¶ 20, 22, 23, 35; PSMF ¶¶ 9, 12, 37].  Defendant argues that no causal link can be inferred because Plaintiff received the accommodation he requested.  [Doc. 42-1 at 15].  Defendant, however, has not cited to any caselaw in support of this argument and the Court finds it unpersuasive.  [Doc. 42-1 at 15].  After Plaintiff was granted the requested accommodation and permitted to work away from the practice field, Defendant terminated his employment.  Given the short amount of time between the protected expression and the termination decision, a reasonable jury could find a causal connection despite the fact that Defendant granted Plaintiff his requested accommodation.

Defendant also contends that Plaintiff's misconduct in entering false information on his timesheet constitutes an intervening act that eliminates any inference of

causation.  [Doc. 42-1 at 16-17].  On this issue, the Court agrees with Defendant.  In Henderson v. FedEx Express, 442 F. App'x 502 (11th Cir. 2011), the Eleventh Circuit addressed a situation remarkably similar to the present case.  The plaintiff in Henderson engaged in protected activity on September 14, 2005 and was terminated two weeks later on September 28, 2005.  Id. at 506-07.  The close temporal proximity between the events normally would have been sufficient to create an inference of causation.  However, the Eleventh Circuit found that plaintiff failed to establish a *prima facie* case of retaliation because, *inter alia*, plaintiff was found to have falsified his time card shortly after he complained of discrimination.  Id. at 504, 506-07.  The Court held, "Henderson's falsification of his time card was an intervening act of misconduct that diminished any inference of causation that may have arisen out of the temporal proximity between his September 14 interview and his termination."  Id. at 507 (citing Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1136 (8th Cir. 1999)).

Similarly, in the present case, the one-month period of time between Plaintiff's protected expression in mid-February 2019 and his termination in mid-March 2019 would typically be sufficiently close to establish a causal link.  [DSMF ¶¶ 20, 22, 23, 35; PSMF ¶¶ 9, 12, 37].  However, the record reveals that Defendant learned in late-February 2019 that Plaintiff had falsified his timesheets.  Chief Audit Officer Jana Briley completed an investigation of Plaintiff's timekeeping on February 27, 2019 and

found that Plaintiff had reported false information on his timesheets for January 22, 29, and 30, 2019.  [DSMF ¶¶ 26, 27; Pl. Resp. to DSMF ¶ 27; PSMF ¶¶ 29, 30; Doc. 44-1].  In addition, the Internal Audit Report noted, "When asked about being absent from work on the dates listed above, Mr. Ball stated he was at work and only remembered being absent one day – either January 29th or 30th; however, he could not recall which day." [Doc. 44-1 at 1].  Plaintiff admitted during his deposition that the Internal Audit Report's conclusions were correct.  [DSMF ¶ 29; Pl. Dep. at 44].  Plaintiff was terminated in a meeting on March 11, 2019.  [DSMF ¶¶ 35, 36; PSMF ¶ 37].  The undersigned finds that Plaintiff's misconduct in falsifying his timesheets was an intervening act that "eroded any causal connection that was suggested by the temporal proximity of his protected conduct and his termination." Kiel, 169 F.3d at 1136; accord Henderson, 442 F. App'x at 507.  "An employer who learns of potential unlawful conduct committed by one of its employees or of a work rule violation should not have to refrain from taking investigative and disciplinary action merely because the employee also recently engaged in protected conduct." Taylor v. CSX Transp., 418 F. Supp. 2d 1284, 1312 (M.D. Ala. 2006).

In light of these facts, the undersigned concludes that Plaintiff is unable to establish a *prima facie* case of retaliation under the Rehabilitation Act.  Plaintiff has failed to cite to evidence which would permit a reasonable jury to find that his request

for an accommodation was a but-for cause of his termination.  Furthermore, for the reasons discussed *infra*, even if Plaintiff were able to establish a *prima facie* case, summary judgment would be warranted on Plaintiff's retaliation claim because Defendant has offered a legitimate, non-discriminatory reason for terminating Plaintiff's employment and he has failed to show this reason is pretextual.

As previously noted, after a *prima facie* case has been established, the burden of production shifts to the defendant to articulate some legitimate, non-discriminatory reason for the adverse employment action.  See McDonnell Douglas, 411 U.S. at 802-05.  "[T]o satisfy this intermediate burden, the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus."  Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 257 (1981).  In the present case, Defendant asserts that Plaintiff was fired because he falsified his timesheets for January 22, 29, and 30, 2019.  [DSMF ¶¶ 26, 27, 30, 31; Pl. Resp. to DSMF ¶ 27; PSMF ¶¶ 29, 30; Doc. 44-1].  Defendant has obviously carried its "exceedingly light" burden of production.  Burgos-Stefanelli, 410 F. App'x at 247 (citation and internal quotation marks omitted).

Under the McDonnell Douglas framework, "the plaintiff then must show that the legitimate reasons offered by the employer for taking the adverse action were pretexts

for unlawful retaliation, . . . and that the plaintiff's protected activity was the 'but-for' cause of the adverse action." Mealing v. Georgia Dep't of Juvenile Justice, 564 F. App'x 421, 427 (11th Cir. 2014) (citing Nassar, 570 U.S. at 362; Sims v. MVM, Inc., 704 F.3d 1327, 1334 (11th Cir. 2013); Pennington v. City of Huntsville, 261 F.3d 1262, 1266 (11th Cir. 2001)).   The Eleventh Circuit has "repeatedly emphasized that [p]rovided . . . the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it[.]" Gogel v. Kia Motors Mfg. of Georgia, Inc., 967 F.3d 1121, 1136 (11th Cir. 2020) (citations and internal quotation marks omitted).  "Thus, to establish pretext at the summary judgment stage, a plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." Id. (citations and internal quotation marks omitted).

The Court finds that Plaintiff Ball has failed to meet Defendant's proffered reason head on and rebut it.  Plaintiff contends that Defendant has offered "shifting explanations" for its actions, but his argument on this issue consists of merely pointing to snippets of testimony from various employees which are not inconsistent.  [Doc. 53 at 12].  For example, Plaintiff argues that the testimony of Employee Relations Director Denise Gebara "is all over the map." [Doc. 53 at 11-12].  This is incorrect.  Gebara

testified that after she received the Internal Audit Report showing that Plaintiff had falsified his timesheets, Gebara found that in all but unusual circumstances, termination was the appropriate sanction.  [DSMF ¶ 32, 33].  Gebara also informed the heads of Legal Affairs (Maura Copeland) and HR (Rebecca Carroll) that in prior instances of misconduct similar to Plaintiff's, GSU terminated the employee.  [Gebara Dep. at 13]. In addition, Gebara testified that Carroll and Copeland told her that Plaintiff would be terminated because of the Internal Audit Report.  [PSMF ¶ 39; Gebara Dep. at 10-12]. Contrary to Plaintiff's assertion, Gebara's testimony is not inconsistent and it is not "all over the map."[5]

As discussed *supra*, Chief Audit Officer Jana Briley found that Plaintiff had falsified his timesheets for January 22, 29, and 30, 2019.  [DSMF ¶¶ 26, 27; Pl. Resp. to DSMF ¶ 27; PSMF ¶¶ 29, 30; Doc. 44-1].  Plaintiff was absent from work on these three days, but he recorded on his timesheets that he had worked regular hours.  [Id.]. The Internal Audit Report noted, "When asked about being absent from work on the dates listed above, Mr. Ball stated he was at work and only remembered being absent one day – either January 29th or 30th; however, he could not recall which day."  [Doc.

---

[5] Plaintiff also notes that a number of people were involved in the termination decision, but this obviously does not create any inference of pretext or retaliatory animus.  [Doc. 53 at 12].

44-1 at 1]. Falsifying time violates GSU policy and when an employee is found to have falsely entered time, the standard practice at GSU is to fire the employee. [DSMF ¶¶ 30, 31]. Moreover, Plaintiff has repeatedly acknowledged that he entered incorrect information on his timesheet. Plaintiff admitted during his deposition that the Internal Audit Report's conclusions were correct and during the termination meeting on March 11, 2019, Plaintiff admitted to Director of Football Operations Fitzgerald and Deputy Athletic Director Sweany that he had entered incorrect hours on his timesheets. [DSMF ¶¶ 29, 35, 36; PSMF ¶ 37; Pl. Dep. at 44]. Plaintiff also gave an interview to the Statesboro Herald while the present litigation was pending in which he acknowledged that he had entered incorrect hours. [DSMF ¶ 39]. These facts would not permit a reasonable factfinder to conclude that Plaintiff had "demonstrate[d] such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in Defendant's proffered reason for terminating his employment that a reasonable jury could find it "unworthy of credence." Gogel, 967 F.3d at 1136 (citations and internal quotation marks omitted).

In sum, Plaintiff Ball has failed to establish a *prima facie* case of retaliation. Plaintiff has not identified evidence which would permit a reasonable jury to find that his protected expression was a but-for cause of his termination. See Frazier-White, 818 F.3d at 1258. Furthermore, even assuming Plaintiff were able to establish a *prima*

*facie* case, summary judgment would be warranted because he has not carried his burden of showing that Defendant's proffered reason for terminating his employment was a pretext for retaliation.  It is, therefore, **RECOMMENDED** that Defendant's Motion [Doc. 42] for Summary Judgment be **GRANTED** on Plaintiff's retaliatory termination claim brought pursuant to the Rehabilitation Act.  [Doc. 4, Count II].

IV.    **CONCLUSION**

Based on the foregoing reasons and cited authority, the Court **RECOMMENDS** that Defendant Board of Regents' Motion for Summary Judgment [Doc. 42] be **GRANTED** on all of Plaintiff Ball's claims and that this action be **DISMISSED WITH PREJUDICE**.

As this is a Final Report and Recommendation and there are no other matters pending before this Court, the Clerk is directed to terminate the reference to the undersigned.

**SO ORDERED AND REPORTED AND RECOMMENDED**, this  5   day of May, 2021.

_____
LINDA T. WALKER
UNITED STATES MAGISTRATE JUDGE